IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH MOSES,

               *Plaintiff,*

   v.

UNITED STATES STEEL CORPORATION,

               *Defendant.*

Civil Action No. 2:20-cv-752

Hon. William S. Stickman IV

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

     Plaintiff Kenneth Moses ("Moses") filed suit against United States Steel Corporation ("USS") for allegedly terminating his employment on the basis of his race. (ECF No. 1-3). Moses requests relief for violations of the Pennsylvania Human Relations Act ("PHRA") (Count I) and 42 U.S.C. § 1981 (Count II). Pending before the Court is USS's Motion for Summary Judgment. (ECF No. 58). For the reasons set forth below, USS's motion will be granted.

## I.      **Factual Background**

     USS is a large steel producer. (ECF No. 67, ¶ 1). Moses is an African American male who was initially hired by USS as a union snapper in the blast furnace at the Edgar Thomson Works in 2005. (*Id.* ¶¶ 22-24). For the first eight years of his employment with USS, Moses "had no significant discipline or safety issues." (*Id.* ¶ 26).[1] In 2013, Moses obtained the position of

---

[1] Though the parties do not dispute that Moses's first eight years of employment were "uneventful," the record demonstrates that between 2005 and 2013, Moses was disciplined on numerous occasions, albeit for relatively minor offenses. (ECF No. 67, ¶ 26). On May 31, 2005, Moses received a one-day suspension for "Absenteeism/Tardiness[.]" (ECF No 68-2, p. 118). On June 3, 2009, Moses received a five-day suspension subject to discharge for a verbal altercation with another employee. (*Id.*). On January 30, 2010, Moses received a five-day suspension for a

Operating Technician 1 – Labor Grade 3 in the Transportation Department.  (*Id.* ¶ 27).  In this capacity, he was "responsible for performing the pivotal role of locomotive operator, moving engines and railcars around the property by remote-control." (*Id.* ¶ 28).  Shortly thereafter in July 2013, USS employees Amel Brown ("Brown") and Pierre Bien-Aime reportedly witnessed Moses "jump onto [a] locomotive while it was in motion." (ECF No. 61-1, p. 134).  At the time, Brown was one of Moses's supervisors.  (ECF No. 73, ¶ 70).  For this alleged "potential cardinal rule violation," Moses received a ten-day suspension subject to discharge.  (ECF No. 61-12, pp. 3-4; ECF No. 68-2, pp. 115, 118; ECF No. 73, ¶ 79).  In December 2013, Moses was initially suspended for five days subject to discharge for an "[u]njustified absence on 12/24/13." (ECF No. 68-2, p. 118; ECF No. 73, ¶ 87).  Moses's suspension was later reduced to three days.  (ECF No. 68-2, p. 118; ECF No. 73, ¶ 88).

In June 2014, supervisor Brown confronted Moses regarding his alleged failure to submit a required engine report.  (ECF No. 73, ¶ 90).  In his deposition testimony, Moses asserted that Brown shouted at him, accusing him of being "above the rules" and an "idiot." (ECF No. 68-3, p. 22).  Moses stated that he "started walking away" from Brown, and that Brown "started following [Moses]" while "still yelling" at him.  (*Id.* at 22-23).[2]  A witness to the incident, Daniel Cain ("Cain"), provided a witness statement in which he wrote that Brown asked Moses, "why the fuck didn't you fill [the engine report] out." (ECF No. 68-2, p. 105).  Cain continued, "as [Brown] started yelling[,] [Moses] got out of his seat and walked away trying to avoid confrontation with [Brown.]" (*Id.*).  Additionally, one of Moses's white colleagues, Adam O'Neill ("O'Neill"), provided a written statement saying, "[t]his problem with Kenneth Moses and Sonny Brown has

---

"USS POLICY VIOLATION[.]" (*Id.*).  On July 22, 2013, Moses received a one-day suspension for "[u]nsatisfactory work on 7/21/13[.]" (*Id.*).

[2] USS disputes Moses's characterization of these events.  (ECF No. 73, ¶¶ 91-100).

been a[n] ongoing problem with just Kenny being [h]arrassed." (ECF No. 68-2, p. 106; ECF No. 73, ¶¶ 106, 107). O'Neill continued, "I … had multiple times been told to fax my engine report over without any punishment or harassment from the [] boss." (*Id.*). "At a 9(b) hearing, Brown admitted that he 'may have yelled' at Moses." (ECF No. 73, ¶ 108). The confrontation between Moses and Brown culminated in Moses being "immediately removed from the floor and suspended." (*Id.* ¶ 101).[3] USS's 9(b) hearing notes "indicate that Moses told [USS's] labor relations representative, Ashley Wissinger, that he felt he was being 'harassed' and that he accused Brown of being 'a racist.'" (*Id.* ¶ 109) (quoting ECF No. 68-2, p. 107). USS did not investigate Moses's allegations against Brown, though it denies that Brown harassed Moses. (ECF No. 73, ¶ 112). (*See also* ECF No. 68-11, p. 7).[4]

"In August 2014, Moses was again suspended, this time for failing to bump test his CO monitor." (ECF No. 67, ¶ 38).[5] "Two months later, in October 2014, Moses climbed up and over the coupler attaching two railroad cars[,]" resulting in "another five-day suspension, subject to discharge, which the Company later converted to a Last Chance Agreement" ("LCA"). (*Id.* at ¶¶

---

[3] Moses's disciplinary record shows a five-day Suspension Subject to Discharge for "Committing an Unsafe Act, 6/15/2014." (ECF No. 68-2, p. 118). A second disciplinary action for "Threatening Conduct Toward a Supervisor, 6/15/2014" was removed from Moses's record. (*Id.* at 117).

[4] USS has both a written Equal Employment Opportunity Policy ("EEO Policy") and a written Sexual and Discriminatory Harassment Policy. (ECF No. 61-1, pp. 46-52). The EEO Policy states in part, "[t]his policy includes recognition of an employee's right to work in an environment free from discriminatory harassment … [.]" (*Id.* at 46). The Sexual and Discriminatory Harassment Policy states that "discriminatory harassment is absolutely prohibited" and that "[m]anagement is responsible for conducting a prompt and appropriate investigation" in the event of a discriminatory harassment allegation. (*Id.* at 49, 51).

[5] According to USS, CO monitors "are designed to protect employees from toxic gas exposure and require [bump testing] before use." (ECF No. 59, p. 11). When asked about the significance of bumping one's monitor, Moses stated, "I don't know, I guess they – I don't know. They look at it as a safety, everybody is supposed to have a gas monitor on." (ECF No. 61-9, p. 9).

41, 45; ECF No. 68-2, p. 117; ECF No. 61-1, p. 3).[6]   The LCA stated in relevant part that "[e]mployee understands that he must comply with all plant rules and regulations" and "that a failure to comply with all plant rules and regulations will result in suspension subject to discharge." (ECF No. 61-1, p. 3).   The LCA was signed on April 22, 2015 by Krista Marcin, Department Manager – Labor Relations, Ross McClellan, Jr., USW District 10 Staff Rep., and Moses.   (*Id.*).   Around April 20, 2015, Moses returned to work.   (ECF No. 73, ¶ 124).

The following incident resulted in Moses's discharge on December 4, 2015.   (ECF No. 73, ¶ 156).   "On November 24, 2015, Moses was pulling two railcars with a remote-controlled engine across the plant."   (ECF No. 67, ¶ 51).   "Later that shift, Moses had to change tracks by bringing the engine with the cars backward through a switch, throwing the switch once the engine and cars were through, and then moving them back through the switch onto another track."   (*Id.* ¶ 53).   As Moses conducted this maneuver, the train struck a derailer, causing "the lead wheels of the engine to go off the track."   (ECF No. 73, ¶ 139).   USS's incident report describes what occurred as follows:

> Train operator was in the process of taking 2 revert cars to the BOP and as the operator was coming down the foundry lead the operator attempted to stop the loco numerous times but the loco did not respond to the remote box which caused the loco to strike a derail and cause the rear wheels of the loco to go on the ground.

(ECF No. 61-1, p. 19).   The report goes on, "Employee was not in proper position when bringing the loco down the track and did not operate at a safe speed."   (*Id.* at 20).   The parties vehemently contest the underlying facts of the November 24, 2015 incident.   Specifically, they dispute whether the locomotive's brakes were working properly at the time of the incident, whether Moses was standing in the correct position as he moved the locomotive and accompanying cars, whether

---

[6] According to an email sent by Robert Williams ("Williams"), one of Moses's supervisors, Moses was previously "contacted" in April 2014 regarding this same safety rule.   (ECF No. 61-1, p. 140).

Moses notified his supervisor in a timely manner, and whether he had the requisite control over the locomotive and accompanying cars when the derailment occurred. (ECF No. 73, ¶¶ 170-191; ECF No. 67, ¶¶ 50-89).

Moses initially received a five-day suspension subject to discharge for performing work in an unsafe manner. (ECF No. 73, ¶ 153). On December 4, 2015, USS converted Moses's suspension to discharge. (*Id.* ¶ 156). Through his union, Moses protested his termination and requested that his suspension be removed, his disciplinary record cleared, and that he be paid "all monies due." (ECF No. 68-2, p. 114). A step two hearing was held on January 5, 2016, with USS Labor Relations Representative Tegan Groves ("Groves") presiding. (*Id.*).[7] On January 29, 2015, Groves denied Moses's request. (*Id.* at 114-116). In her written opinion, Groves found that Moses had violated The Blast Furnace & Transportation Department Safety Rules, specifically rule RT-01. (*Id.*). Rule RT-01 states:

> Engineers, Conductors, and Train Operators shall be held responsible for violations of any rule concerning the safety and control of equipment in their charge and shall take every precaution for the protection of such equipment, even if not specifically provided by the rules.

(*Id.* at 115). Groves determined that "Moses failed to provide 'head end protection' and was not in the proper position when the train derailed." (ECF No. 73, ¶ 162) (quoting ECF No. 68-2, p. 116). According to Groves,

> RT-12 specifically states that Head End protection shall be provided in the direction of movement at all times and the operator can accomplish this by (1) preceding the lead car or locomotive on foot or (2) assuming a position which will enable them to see the area ahead of the lead car or locomotive.

---

[7] USS Labor Relations Representative Tegan Groves, Area Manager Mark Logoyda, Union Grievance Chairman Bob Morin, Union Grievance Representative Adam O'Neill, and Moses were in attendance. (ECF No. 68-2, p. 114).

(ECF No. 68-2, p. 116). Groves concluded that "Moses failed to provide head end protection based on her recollection of Moses's statement that 'once the locomotive came to a complete stop[,] he walked back to see how far it traveled and noticed the engine had derailed[.]'" (ECF No. 73, ¶ 164) (quoting ECF No. 68-2, p. 116). Groves viewed Moses's statement as "validating that he was not preceding the lead car or locomotive nor was he in a position to see the area ahead of the lead car or locomotive." (ECF No. 68-2, p. 116). Groves also wrote that Moses "stated that he applied the brakes and noticed that the engine was not stopping however the data recorder indicates that [Moses] never applied the brakes." (*Id.*). She further noted that "[a]ll equipment used during [the] incident was tested and proven to be functional." (*Id.*).

In upholding Moses's termination, Groves wrote, "[Moses] was properly disciplined and discharged for having performed an unsafe act. [Moses] operated a locomotive in a hazardous, uncontrolled manner. [Moses] should be in control of his locomotive at all times, but his negligence and reckless behavior resulted in an unsafe act." (*Id.*). Groves additionally took into consideration Moses's "lengthy discipline record." (*Id.*). After a step three hearing was conducted on March 11, 2016, the decision to terminate Moses was affirmed. (*Id.* at 120-122; ECF No. 73, ¶ 192).

On November 27, 2019, Moses commenced this action against USS in the Court of Common Pleas of Allegheny County, Pennsylvania, requesting relief for USS's alleged "disparate treatment in disciplinary procedures and termination because of his race." (ECF No. 1-3, p. 3; ECF No. 1-1, p. 1). USS removed the action to this court pursuant to 28 U.S.C. §§ 1441 and 1446. (ECF 1-1, p. 1).

## II.    Standard of Review

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## III.    Analysis

At Count I, Moses brings a PHRA claim, alleging that USS disciplined and terminated him because of his race. Moses further alleges that USS discriminated against him "by treating him differently than similarly situated non-African-American employees whom engaged in similar or worse conduct for which Moses's employment was allegedly terminated." (ECF No. 1-3, p. 8). At Count II, Moses brings a § 1981 claim, alleging the same.

"In the context of employment discrimination, PHRA and § 1981 claims are analyzed together, as they are 'governed by essentially the same legal standards.'" *Wolfgramm v. Commc'ns Workers of Am. Loc. 13301*, Civil Action No. 19-3701, 2022 WL 952634, at *5 (E.D. Pa. Mar. 30, 2022) (internal quotation omitted). The burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) applies to claims of discrimination under both § 1981 and the

PHRA.  *Barnes v. Nationwide Mut. Ins. Co.,* 598 F. App'x 86, 89 (3d Cir. 2015).  This framework requires Moses to first establish "a prima facie case of racial discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802.  If Moses is successful in establishing a prima facie case, "the burden then must shift to [USS] to articulate some legitimate, nondiscriminatory reason for [Moses's] rejection." *Id.*  If USS succeeds, then Moses "must prove by a preponderance of the evidence that [USS's] purported legitimate reason is mere pretext."  *Barnes,* 598 F. App'x at 89 (citing *McDonnell Douglas Corp.,* 411 U.S. at 804).

Under § 1981, "a plaintiff bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* __ U.S. __, 140 S. Ct. 1009, 1014 (2020).  "While the burden of production may shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Bullock v. Child's. Hosp. of Philadelphia,* 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999) (quoting *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 253, (1981)).

### A.  Moses has established a prima facie case

To establish a prima facie case of discrimination under § 1981 or the PHRA, Moses must show that "(1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Barnes,* 598 F. App'x at 89 (quoting *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008)).  "The major purpose of the prima facie case is to 'eliminate the most obvious lawful reasons for the defendant's actions (i.e., the position that an applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually

taken, etc.).'" *Bullock,* 71 F. Supp. 2d at 488 (quoting *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 352 (3d Cir. 1999)).

The parties do not dispute that Moses (1) was a member of a protected class; (2) was qualified for the position; and (3) suffered an adverse employment action. (ECF No. 67, ¶ 22; ECF No. 73, ¶¶ 133, 156; ECF No. 59, p. 4; ECF No. 66, p. 11, n. 9). However, USS argues that summary judgment should be granted in its favor because Moses cannot establish the fourth element of his prima facie case – an inference of unlawful, intentional discrimination. (ECF No. 59, pp. 4-9). Alternatively, USS argues that "Moses cannot identify any evidence supporting that USS fabricated its reason for terminating him." (ECF No. 59, p. 14).

"Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class." *Bullock,* 71 F. Supp. 2d at 487.[8] However, the plaintiff is not required to "make out a prima facie case with such evidence." *Id.* (citing *Pivirotto,* 191 F.3d at 356-357). *See also Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 269 (3d Cir. 2010) (citation omitted) ("Although comparative evidence is often highly probative of discrimination, it is not an essential element of a plaintiff's case."). Rather, a prima facie case "clearly require[s] only 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'" *Pivirotto,* 191 F.3d at 356 (quoting *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312, (1996)).

---

[8] In *Bullock,* the United States District Court for the Eastern District of Pennsylvania analyzed the claim before it only under Title VII. However, the court noted that its "analysis and conclusions are equally applicable to [Bullock's] claim of discrimination in violation of § 1981 and the PHRA." *Bullock,* 71 F. Supp. 2d at 485 (citing *Harris v. Smithkline Beecham,* 27 F.Supp.2d 569, 576 (E.D. Pa. 1998)).

Because the parties do not dispute that the first three requirements for a prima facie claim have been met, the Court will focus its analysis on the fourth element – whether Moses was fired under circumstances that could give rise to an inference of intentional discrimination. Moses relies heavily on his own largely unsubstantiated testimony to show that his employment was terminated on the basis of his race. Through his deposition testimony, Moses asserts that "[t]he whole environment [at USS] was uncomfortable" and "racist." (ECF No. 68-3, p. 16). Specifically, his testimony alleges that a number of racist remarks were made by various USS supervisors during his time at USS. [9] Such allegations, alone, however, do not suffice for purposes of establishing a prima facie case because "statements even by decisionmakers cannot constitute evidence if there is no evidence somehow linking that person to the actual employment decision." *Jones v. Sch. Dist. of Philadelphia*, 19 F. Supp. 2d 414, 420 (E.D. Pa. 1998), *aff'd*, 198 F.3d 403 (3d Cir. 1999); *see also Pivirotto*, 191 F.3d at 359) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight... [.]" (citation omitted)).

Although it is a close call, viewing the evidence in a light most favorable to Moses, the Court finds that an inference of intentional discrimination exists. It is undisputed that four of the six violations (dated 7/24/2013, 12/24/2013, and 6/15/2014 (two violations)) that occurred over the last two years of Moses's employment at USS were initiated by supervisors Brown and

---

[9] Though denied by USS, Moses testified that Jay Rosser, one of Moses's supervisors, stated that "black guys are always late," and joked, "what do you call a black man in a suit[?] … a defendant." (ECF No. 68-3, pp. 7-8). Moses testified that, on a separate occasion, Brown told one of Moses's fellow black co-workers, "if a [b]lack guy can't go get water, what is he good for[?]" (*Id.* at 7). Moses further alleged that while he was training an individual, his colleagues told the individual that Moses was "teaching [him] ebonics." (*Id.*). Additionally, Moses testified that supervisor John Basista stated that more black individuals could not be hired because "they couldn't find anyone that wasn't on drugs or that [ ] didn't have a criminal background." (*Id.* at 13). Moses also testified that when Williams moved to a different area, he said that "he ha[d] less blacks in his neighborhood." (*Id.* at 7). Though not an exhaustive list of Moses's allegations, these assertions exemplify Moses's perception of the workplace environment at USS.

Williams (ECF No. 73, ¶ 130), both of whom Moses alleges made racist remarks in his presence. Moses's termination was predicated, in part, on his "lengthy discipline record," a record which Brown and Williams participated in developing.  (ECF No. 68-2, p. 116; ECF No. 73, ¶ 187). Moreover, Moses's allegations of discriminatory conduct are bolstered by one of Moses's white colleagues, O'Neill, who provided a written statement saying, "[t]his problem with Kenneth Moses and Sonny Brown has been a[n] ongoing problem with just Kenny being [h]arrassed."  (ECF No. 68-2, p. 106).  O'Neill continued, "I … had multiple times been told to fax my engine report over without any punishment or harassment from the [] boss."  (*Id.*).  Brown admitted that USS disciplined Moses for his failure to fax paperwork in a timely manner; the very act that O'Neill contends does not typically result in discipline.  (ECF No. 68-11, p. 7).  Furthermore, while O'Neill's statement makes no mention of race as a motivating factor, his belief that Brown "harassed" Moses gives credence to Moses's allegations of racial discrimination at USS.

After the June 15, 2014 altercation between Brown and Moses, USS's 9(b) hearing notes "indicate that Moses told [USS's] labor relations representative, Ashley Wissinger, that he felt he was being 'harassed' and that he accused Brown of being 'a racist.'"  (ECF No. 73, ¶ 109) (quoting ECF No. 68-2, p. 107).  USS did not investigate Moses's allegations against Brown even though its policy was to conduct "a prompt and appropriate investigation" in the event of a discriminatory harassment allegation.  (ECF No. 61-1, p. 51; ECF No. 68-11, p. 7) (*see also* ECF No. 73, ¶ 112).[10]

At the prima facie stage, the Court will "presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Texas Dep't of Cmty. Affs*, 450 U.S. at 254 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)).  Given

---

[10] USS denies that Brown "harassed" Moses.  (ECF No. 73, ¶ 112).

that establishing a prima facie case "'is not onerous' and poses 'a burden easily met,'" the Court finds that Moses has met his burden of establishing his prima facie case.  *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Texas Dep't of Cmty. Affairs,* 450 U.S. at 253).

**B.  USS has articulated a legitimate, non-discriminatory reason for Moses's termination**

USS has successfully articulated a legitimate, nondiscriminatory reason for Moses's termination.  "The defendant need only produce evidence of one or more legitimate reasons, 'which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the adverse employment action.'"  *Johnson v. Fed. Exp. Corp.,* 996 F. Supp. 2d 302, 318 (M.D. Pa. 2014), *aff'd,* 604 F. App'x 183 (3d Cir. 2015) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 502 (1993)).  Moses not only had an extensive disciplinary history dating back to 2005, but was also on a LCA when he derailed a locomotive.  The LCA plainly stated that failure to comply with USS's rules and regulations would result in suspension subject to discharge. (*See* ECF No. 61-1, p. 3).  By its very nature, once Moses was placed on the LCA, he had one last chance to abide by USS's rules and regulations.  According to USS, when he failed to do so, USS terminated his employment.

**C.  Moses has failed to prove that USS's non-discriminatory reason for his termination was merely pretextual**

"A plaintiff may demonstrate pretext by presenting evidence from which a reasonable factfinder could 'either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Johnson,* 996 F. Supp. 2d at 319 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)).  As to the first prong,

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Fuentes,* 32 F.3d at 765 (internal citations and quotations omitted).  In other words, "a plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones v. Sch. Dist. Of Philadelphia,* 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Keller v. Orix Credit All., Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997)).  As to the second prong, the plaintiff "also may survive summary judgment by pointing to evidence in the record which 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* (quoting *Fuentes,* 32 F.3d at 764).

Moses argues that he has met his burden of establishing pretext through either prong of the *Fuentes* test. The Court disagrees.

Turning to the first prong, Moses contends that USS's "ultimate reason justifying the firing – that Moses failed to provide 'head end protection' – is false." (ECF No. 66, p. 20).  Yet in her written opinion, Groves based her conclusion on Moses's own account of what occurred.  In Moses's derailment statement, he wrote in part, "I proceeded to apply the brakes and notice[d] the engine not stopping so once it came to a complete stop I walked back to see how far it traveled being aware of the tight space and notice[d] the engine had derailed." (ECF No. 61-1, p. 151).  RT-12 specifically states that head end protection shall be provided in the direction of movement at all times and the operator can accomplish this by (1) "preceding the lead car or locomotive on foot" or (2) "assuming a position which will enable them to see the area ahead of the lead car or

locomotive." (ECF No. 68-18, p. 34).  Groves viewed Moses's statement as "validating that he was not preceding the lead car or locomotive nor was he in a position to see the area ahead of the lead car or locomotive." (ECF No. 68-2, p. 116).  Based on the record, the Court sees no error in Groves's assessment.  Even if Groves's determination was flawed, "[i]t is not for the Court to sit as a super human resources department and re-examine [USS's] business decisions." *Frank v. PNC Fin. Servs. Grp., Inc.,* Civil Action No. 12-34, 2013 WL 4432857, at *8 (W.D. Pa. Aug. 15, 2013) (citation omitted).  Moses cannot show that Groves's assessment was "so plainly wrong that it cannot have been [Groves's] real reason." *Jones,* 198 F.3d at 413 (quoting *Keller,* 130 F.3d at 1109).

Next, Moses contends that Groves did not properly consider his claim that the remote he was using malfunctioned as he was attempting to change tracks with his locomotive.  (ECF No. 66, p. 21).  However, the record demonstrates that Groves relied on information relayed to her by Brad Horner ("Horner"), Todd McBride ("McBride"), and third-party experts in determining that "[a]ll equipment used during this incident was tested and proven functional." (ECF No. 68-2, p. 116).[11]  Horner forwarded an email to Groves in which he stated "[f]ound air leak in unit which converts remote signal to air pressure in locomotive (however, air pressure read good)." (ECF No. 68-2, p. 134).  Also, in Groves's handwritten notes, she wrote, "Todd McBride found oil in one of the manifolds" and that this "could [a]ffect train break" but that the oil in the manifold would "not [a]ffect [the] independent break (which is the engine break)." (*Id.* at 124).  While the parties strongly dispute whether the remote was functioning properly on the day of the incident, Groves relied on information relayed to her by Horner and McBride to assure herself that the air pressure

---

[11] Horner was the Blast Furnace Coordinator.  (ECF No. 67, ¶ 62).  McBride was "one of [USS's] employees responsible for servicing the remote-control boxes." (ECF No. 73, ¶ 159).

in the unit was within its proper parameters and that Moses would still have had the option to stop the locomotive with the independent break if the train break proved faulty. Moreover, it is undisputed that "[b]y the time of the Step 3 hearing, third-party experts retained by USS had tested the remote-control box and verified that all equipment was fully functioning." (ECF No. 67, ¶ 78). The remote was tested three days prior to Groves's written step two minutes and was found to be "operating 100%." (ECF No. 68-2, p. 90). Nothing in the record would lead a reasonable factfinder to believe that USS's determination that the remote was properly functioning should be "unworthy of credence." *Jones,* 198 F.3d at 413 (quoting *Keller,* 130 F.3d at 1108).

Moses additionally takes issue with Groves's assertion that he neglected to stop and promptly call his supervisor once the derailment occurred. (ECF No. 66, p. 21). But here too, the record reflects that Horner emailed Groves stating, "[t]he event recorder showed throttle changes and/or brake air pressure changes during the time of the derailment. Throttled up for approximately 40 seconds trying to move[ ] forward after being derailed per event recorder and engine was physically moved 6-8 feet back through the derail." (ECF No. 68-2, p. 136). Horner also testified that when he watched the video of the derail, he witnessed Moses "change[ ] the direction of travel and move[] the train after the derailment." (ECF No 61-8, p. 8). When asked if moving a train after a derail was improper, Horner responded, "Yes … [b]ecause you're not supposed to move equipment after an incident." (*Id.*). In the minutes from the step two hearing, Groves wrote,

> Grievant did not comply with the Stop and Act rule requiring employees to access the situation, consider alternatives and then take appropriate action including communication with co-workers and supervision. Grievant knew that he derailed and he should have stopped and called his supervisor immediately. However, Grievant throttled up for approximately 40 seconds trying to move forward after being derailed and the engine was moved 6-8 feet back through the derail.

(ECF No. 68-2, p. 116). Moses, however, discounts Groves's account by pointing to wholly unrelated incident reports involving other USS employees which, according to Moses, "indicate

that proper notice was given even though the employees involved only belatedly noticed a train had derailed." (ECF No. 66, p. 21) (citing ECF No. 61-1, pp. 60, 85, 110). Yet the descriptions of each of these instances show that once the employees noticed that car(s) had derailed, they notified their supervisor prior to taking any further action. An incident dated July 1, 2016, was described as follows:

> Trestle crew had just coupled into a string of ore cars to bring to the trestle to dump. The loco operator was given the command to draw back by the groupleader and the loco attempted to pull back without success. The groupleader then walked back to check for applied brakes when he noticed 4 cars that were derailed. All appropriate personnel were notified at this time.

(ECF No. 61-1, p. 60). Even though the employee "only belatedly noticed a train had derailed" (ECF No. 66, p. 21), the employee did not attempt to move the train after the incident, but rather notified personnel upon realizing that a derailment had occurred. Similarly, an incident dated December 28, 2016, was described as follows:

> The train operator was in the process of pulling two empty ladles down Mixer Hill with locomotive ET1 after they had just been dumped into the Mixer. While riding on the front of the locomotive and after travelling approximately 50 yards, he began to experience difficulty pulling the ladles and stopped the train to investigate. At this time, he noticed that both sets of rear trucks on ladle 16 (the last ladle in the train" were derailed. He then notified supervision of the incident.

(ECF No. 61-1, p. 85). Again, in this instance, once the derail was confirmed, the employee notified his supervisor of the incident and did not try to move the train after the incident. Lastly, on October 7, 2015, an incident occurred wherein a car derailed, and upon noticing the derail, the employee notified appropriate personnel. (*Id.* at 110). These incident reports make clear that timely notice was given once each derailment occurred. Yet Moses's incident report makes no mention of notice whatsoever. (*See* ECF No. 68-2, p. 91). Therefore, Moses cannot use these separate derailment incidents to show that he gave proper notice to his supervisors, nor can he use them to discount Groves's determination to the contrary.

16

Groves relied upon Horner's interpretation of what transpired on November 24, 2015 to conclude that Moses did not provide proper notice to his supervisor. Horner's understanding of what occurred that day was predicated upon watching the video of the derailment and looking at the event recorder data. Moses's testimony to the contrary is not probative of pretext. Thus, Moses has not met his burden of demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Jones,* 198 F.3d at 413 (quoting *Keller,* 130 F.3d at 1108).

Moses additionally points to the fact that "Groves'[s] decision failed to consider that the derailer was not properly marked on the day of the incident." (ECF No. 73, ¶ 170; ECF No. 66, p. 21).[12][13] However, the omission of this fact from Groves's step two minutes does not give rise to the conclusion that USS's justification for terminating Moses was pretextual in nature. As Moses concedes, his failure to provide head end protection was USS's "ultimate reason justifying [his] firing." (ECF No. 66, p. 20). Though he believes this justification to be false, Groves's failure to include any mention of the presence, or lack thereof, of a flag by the derailer, does not amount to evidence from which a factfinder could reasonably disbelieve USS's articulated legitimate reasons for Moses's discharge.

---

[12] According to Dr. Allan M. Zarembski, who was hired by Moses's law firm, it is industry practice to mark derailers with a flag for visibility. (ECF No. 68-18, p. 3; ECF No. 73, ¶ 169).

[13] Notably, in his deposition, Moses testified, "I knew the derailer was there because of my job. You understand? Like I knew where derails, where certain switches and things are. You understand? It would have never hit that derailer if the box would have worked correctly. Never hit it." (ECF No. 68-3, p. 27). Thus, by Moses's own admission, the absence of a blue flag in close proximity to the derailer had no effect on the derail.

Lastly, Moses argues that Brown's involvement in USS's decision to terminate him shows that discrimination was a determinative factor in his firing because of Brown's alleged biased conduct and statements. (ECF No. 66, p. 22). While the evidence demonstrates that Brown may not have liked Moses, the record is completely devoid of any evidence, aside from Moses's own bare assertions, showing that Brown's bias, if any, was predicated upon his race.[14]

The United States Court of Appeals for the Third Circuit's decision in *Jones* affirming the dismissal at summary judgment of § 1981 and PHRA claims brought on the basis of race discrimination and retaliation is instructive.[15]   Charles Jones ("Jones"), an African American former teacher of physics, chemistry and biology, was employed with the School District of Philadelphia from 1985 to 1995. *Jones,* 198 F.3d at 406.  In 1995, he resigned from the school district, claiming that "he would be terminated involuntarily unless he did so." *Id.*[16] In granting the school district's motion for summary judgment, the United States District Court for the Eastern District of Pennsylvania delved into Jones's disciplinary record. In sum, the district court found that

> [w]hile there is ample evidence in the record that plaintiff was the recipient of
> numerous disciplinary memoranda and unsatisfactory classroom evaluations and

---

[14] Moses testified that he overheard Brown tell a fellow African American USS employee, "if a Black guy can't go get water, what['s] he good for."  (ECF No. 68-3, p. 7).  While there is corroborating evidence showing that Brown may not have liked Moses, nothing in the record apart from Moses's own testimony demonstrates that Brown was *racially* biased towards him.  On the contrary, Michael Carter, a fellow African American USS employee, testified that Brown would treat "a black guy bad and a white guy bad," and that Brown "didn't treat [Moses] like he treated me … [Brown] didn't like [Moses] or something for some reason."  (ECF No. 61-15, p. 3; ECF No. 68-10, p. 4).

[15] Jones also brought claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*, and Pa. Stat. Ann. Tit. 43, §§ 951 *et seq.  Jones,* 198 F.3d at 406.

[16] Even though Jones was not fired, the Third Circuit found that he had established a prima facie case for constructive discharge under § 1981 because "his involuntary transfer to two schools and the second school's failure to assign him the physics roster despite his qualifications, was sufficient to establish a prima facie case under section 1981." *Id.* at 412.

that his interpersonal skills, teaching and coaching techniques were criticized by the principals and vice principals of the three high schools at which plaintiff taught, there simply is no evidence that any of these criticisms, unfavorable evaluations or disciplinary/remedial actions resulted from any racial animus or discrimination on the part of the school district.  Although Mr. Jones relies in large measure on Northeast Principal Hoban's alleged racial bias as reflected by his reference sometime in 1990 to an african-american student as a "black princess" and his membership in an all male, nearly all white school-affiliated club, he has produced no evidence that Mr. Hoban bore **him** any racial bias, that it was because of this racial bias that plaintiff was administratively transferred from Northeast High School, or that Hoban played any role in Edison High School Principal Torres' ultimate recommendation to terminate him.

*Jones,* 19 F. Supp. 2d at 419 (emphasis in original).  The Philadelphia school district contended that Jones was transferred and threatened with termination "because of repeated instances of improper conduct," which it supported with "ample evidence of numerous parental complaints about plaintiff's teaching and coaching techniques, unsatisfactory classroom reviews, and disciplinary and warning memoranda generated over the course of plaintiff's ten-year teaching career." *Id.* at 420.  The Third Circuit found that there was "insufficient evidence to support the claim of pretext[,]" noting that "Jones makes numerous allegations in his affidavit which he predicates on nothing more than his beliefs without having actual knowledge of them." *Jones*, 198 F.3d at 414.  In affirming the district court's determination, the Third Circuit found that Jones's Title VII and PHRA claims "should have survived the initial stage of the *McDonnell Douglas* analysis," but nevertheless failed at the pretext stage.  *Id.* at 412.  Similarly, the Third Circuit affirmed the district court's order for summary judgment on Jones's § 1981 claim. *Id.* at 415.

Moses's position as to Brown is analogous to Jones's position as to Principal Hoban.  Jones argued that Principal Hoban "repeatedly targeted him for harassment because of his race" and that "Hoban disciplined Jones several times during his employment at NEHS." *Id.* at 406.  In determining that Jones had to be administratively transferred, Assistant Principal Alvin Vaughn relied, in part, upon "an SEH-204 [a type of formal disciplinary action] dated January 6, 1993,

from Principal Hoban." *Id.* at 408.  Yet the district court found that Jones had failed to produce sufficient evidence to show that Principal Hoban "played any role in Edison High School Principal Torres' ultimate recommendation to terminate him." *Jones,* 19 F. Supp. 2d at 419.  Here too, Moses has failed to show that Brown played a role in USS's determination to discharge him.

Moses points to the fact that Brown was "copied on emails regarding the derailment" and his testimony that he "'probably' talked to Groves about Moses" to show Brown's involvement in his termination. (ECF No. 66, pp. 17-18).[17]  However, Brown's testimony regarding "probably" speaking to Groves is absent from the record before the Court.  Left only with the fact that Brown was copied on emails regarding Moses's derailment, such scant evidence connecting Brown to the derailment and subsequent discharge of Moses does not suffice for purposes of establishing pretext.

Giving Moses the benefit of the doubt, the Court will presume that Brown testified to "probably" talking to Groves about Moses.  Still, Moses has failed to establish that any animus Brown may have had towards him was predicated upon his race, and the record is replete with evidence to the contrary.  Moreover, it is undisputed that "none of [USS's] representatives – including [Mark] Logoyda who hired Moses – objected to Moses's termination." (ECF No. 67, ¶ 82).  Thus, Brown's involvement, if any, with Moses's termination does not "establish some causal nexus" between Moses's termination and his race. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 798 (3d Cir. 2003).

---

[17] Brown's testimony suggests that he did not know that Moses was terminated because of the derailment. (*See* ECF No. 61-11, pp. 3, 13).  However, the record makes clear that he was copied on emails relating to the derailment.  Considering the evidence in a light most favorable to Moses, the Court will not give Brown's testimony any weight as to this issue.

Turning to whether Moses demonstrated pretext by "presenting evidence from which a reasonable factfinder could … (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action[,]" the Court finds that Moses has not met his burden.  *Johnson,* 996 F. Supp. 2d at 319 (quoting *Fuentes,* 32 F.3d at 764).

Moses highlights the June 15, 2014 altercation that he had with Brown to show that he was "singled out by his supervisors for discipline based on his race and that this caused his termination." (ECF No. 66, p. 20).  Indeed, O'Neill, one of Moses's white colleagues, provided a written statement saying, "[t]his problem with Kenneth Moses and Sonny Brown has been a[n] ongoing problem with just Kenny being [h]arrassed." (ECF No. 68-2, p. 106).  Notably, O'Neill's statements made no mention of race.  While such evidence was sufficient to establish his prima facie case, at the pretext stage, Moses needs more.

When asked whether "there was anyone being treated differently because of their skin color[,]" Michael Carter ("Carter"), a fellow African American USS employee, testified,

> I can't say that, … when I see some – some bosses are – I don't know how to say this cordially, but they're just assholes; … That's just basically what it is.  They treated a black guy bad and a white guy bad.  You know, like, I can't say it had nothing to do with – like, they were just assholes to everybody, in my opinion, that's how I looked at it.

(ECF No. 61-15, p. 3). When asked if Brown fell into this category, Carter responded,

> Oh, most definitely … if you ever worked for somebody who was not that bright, and arrogant, it's a bad combination.  I could work for somebody that's not that bright because I knew my job. I could work with somebody that's arrogant because I knew my job. But when you put that combination together, it's a bad combination, in my opinion.

(*Id.* at 3-4).  Carter was then asked whether Brown "was both of those things[,]" to which Carter responded, "[t]o me, he was." (*Id.* at 4).  Later, Carter was asked if Brown treated Moses the same way that he was treated.  Carter answered, "No, he didn't treat Kenny like he treated me.  He was

– him and Kenny, I don't know what they had going on, but it's, like, he didn't like Kenny or something for some reason." (ECF No. 68-10, p. 4). Moses cannot rely on Carter's testimony to show that the "reason" for Brown's differing treatment of Moses must have been his race given that Brown treated Carter, an African American employee, differently than he treated Moses. The record demonstrates that Moses and Brown simply did not get along. As in *Jones*, "there simply is no evidence that any of these criticisms, unfavorable evaluations or disciplinary/remedial actions resulted from any racial animus or discrimination …[.]" *Jones,* 19 F. Supp. 2d at 419.

Moses points to several of his previous disciplinary events to show that discrimination permeated his record at USS. First, Moses refers to his violation for committing an unsafe act on July 24, 2013. The notes from Moses's 9b hearing reflect that he admitted to "stepp[ing] onto the step" of the locomotive while the locomotive was "still moving." (ECF No. 61-1, p. 138).[18] While the parties dispute whether Moses stepped on or off of the moving locomotive, by Moses's own admission, stepping on or off of a moving locomotive is a USS safety violation. (ECF No. 68-3, p. 14). In addition, Moses testified that the locomotive "might have shifted from the brakes" as he got off. (*Id.*). Thus, there is insufficient evidence to support the proposition that Moses's discipline was predicated upon his race, a burden that Moses bears. Moreover, Moses's bare assertion that supervisors "look[ed] the other way" when white employees stepped off of moving locomotives does not give rise to an inference of discrimination. (ECF No. 68-3, p. 15).

Next, Moses argues that he "was disciplined for climbing over a coupler and put on an LCA [when] another employee performing the same act was not." (ECF No. 66, p. 20; ECF No. 73, ¶¶ 125-127). Yet, Moses provides no evidence to show that the other employee had a similar

---

[18] Contrary to USS's 9b hearing notes, Moses testified that he "was getting off of [the locomotive]" rather than stepping onto it. (ECF No. 68-3, p. 14).

disciplinary record when he climbed over the coupler. In fact, Moses does not point to any evidence showing that the employee in question was similarly situated in any way aside from also stepping over a coupler. Instead, Moses points to USS's Response No. 13 to Plaintiff's First Set of Requests for Admissions. In Request for Admission No. 13, Moses asserted that "In 2016, U.S. Steel did not discipline any employee of the Edgar Thompson Works a 5 day suspension for climbing over a coupler." (ECF No. 68-14, p. 14). USS responded in relevant part, "it did not suspend any employee of the Edgar Thompson Works for five days solely 'for climbing over a coupler' in 2016." (*Id.*). USS continued, "Any discipline given in 2016 was determined based on the specific circumstances surrounding the employee's conduct and disciplinary record...." (*Id.*). When Moses climbed over the coupler on October 23, 2014, he already had ten offenses on his disciplinary record. (ECF No. 73, ¶ 128).[19] USS's response to Moses's Request for Admission No. 13 is consistent with its decision to put Moses on a LCA given his extensive disciplinary history and the severity of the infraction. Both Williams and Horner testified to the gravity of Moses's infraction. Williams, who witnessed Moses climb over the coupler and suspended him for doing so, stated that Moses "took a life-threatening shortcut" and showed a "lack of judgment." (ECF No. 61-13, p. 5). Similarly, Horner stated that climbing across a coupler "put [Moses's] life in jeopardy" and was "an extremely unsafe act" such that no circumstance would justify doing so. (ECF No. 61-8, p. 3-4). Nothing in the record demonstrates that Moses was unfairly disciplined because of his race when he stepped over the coupler. On the contrary, the record shows that Moses admitted that he stepped over the coupler and that doing so was a safety violation. (ECF

---

[19] One of Moses's disciplinary offenses – Threatening Conduct Toward a Supervisor, 6/15/2014 – was removed from his disciplinary history. (ECF No. 68-2, p. 117).

No. 61-9, p. 15).  Moses's series of safety violations with no sign of improvement constituted a legitimate reason for USS to place Moses on an LCA.

Similarly, Moses alleges that he was the only USS employee to be discharged after causing a derail.  (ECF No. 66, p. 20).  Moses points to USS's supplemental answer to Plaintiff's Interrogatory No. 12 in which USS represented that only three employees received discipline for causing derailments out of some twenty-five derailments spanning 2015 and 2016.  (ECF No. 68-14, pp. 2-3; ECF No. 68-2, pp. 139-202).  USS responded in part,

> the following individuals were disciplined related to the reported derailments: Jason Grimes (white - 3-day suspension) and Brian Pollack (white - 3-day suspension). Michael Sauritch (white) received a 1-day suspension that was ultimately dropped. Those individuals who were otherwise identified in USS4420USS505 as being involved in the subject derailments did not receive discipline for those derailments.

(ECF No. 68-14, p. 3).  Moses admits that these white employees were not on LCAs when the derailments occurred.  (ECF No. 66, p. 20).  While Moses downplays this fact, its importance should not be understated.  As Groves's step two minutes illustrate, Moses was not terminated solely on the basis of his derailment, but also because of his "lengthy disciplinary record" and LCA.  (ECF No. 68-2, p. 116).  Moreover, the fact that the three other individuals who were disciplined for derailments - Jason Grimes, Brian Pollack and Michael Sauritch - were Caucasian, cuts against Moses's position.  Moses has failed to establish that any of the other USS employees responsible for derailments had similar disciplinary histories.  Compartors "must be similar to [the] plaintiff in 'all relevant aspects.'"  *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014) (quoting *Wilcher v. Postmaster Gen.,* 441 F. App'x 879, 882 (3d Cir. 2011)). Here, Moses stands in stark contrast to his peers.  USS had the right to treat him as such.

## IV.   Conclusion

"Overall, the circumstances of this case which [the Court has] already [ ] described in detail reflect a situation in which the employer should have been able to take adverse employment actions against the employee without fear of being embroiled in an expensive law suit." *Jones,* 198 F.3d at 414. The record demonstrates that USS gave Moses a multitude of chances to improve and learn from his prior violations. Moreover, during his first eight years with USS, Moses was promoted up the ranks, with each promotion coming with additional responsibilities. And when Moses wanted to leave the blast furnace department, USS allowed him to transfer to the transportation department as an Operating Technician I. It is no coincidence, and Moses does not dispute, that during this period, "he had no significant discipline or safety issues." (ECF No. 67, ¶ 26). Just as USS rewarded Moses for his ability to follow USS's rules and regulations during his first eight years, it also disciplined him for violating them in his last two years and was within its right to do so. These violations were not trivial in nature, but rather, carried with them clear risks to life and limb. The gravity and numerosity of these violations culminated in Moses's discharge. USS's position that it fired Moses because he derailed a locomotive while on a LCA is supported by an abundance of evidence; evidence which Moses has failed to demonstrate is merely a pretext for discrimination. Therefore, the Court finds that summary judgement is warranted on Moses's PHRA and § 1981 discrimination claims. Summary Judgment will be granted in favor of USS. Orders of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

8-24-23
Date